```
IN THE MATTER OF THE              *
SEARCH OF THE PREMISES OF         *
Haven Corporation and Eagle Creek *
Fuel Services, LLC                *
6624 and 6630 Quad Avenue         *
Baltimore, Maryland               *
```

FILED NOV 28 2018 CLERK U.S. DISTRICT COURT DISTRICT OF MARYLAND

18-3101-SAG

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Zachary Thomas, being first duly sworn, hereby depose and state as follows:

### BACKGROUND

1. This affidavit has been prepared in support of an application for a warrant to search and seize evidence from a business location at 6624 - 6630 Quad Avenue, Baltimore, Maryland, as more specifically described in Attachment A hereto, and referred to herein as "the premises." As will be more fully explained herein, two different businesses – Haven Corporation (hereinafter "Haven"), and Eagle Creek Fuel Services, LLC (hereinafter "Eagle Creek") – have operated within the space defined as "the premises." This application is part of an ongoing criminal investigation of federal and state laws conducted by the U.S. EPA-CID and the Maryland Attorney General's Office.

2. Your affiant is a criminal investigator with the U.S. Environmental Protection Agency Criminal Investigation Division (EPA-CID) assigned to the Washington D.C. Resident Office. I have served in this capacity since 2018. Prior to my assignment with EPA-CID, I spent approximately 1 year with the EPA Protective Services Detail (PSD) as a Special Agent, and approximately 9 years with the United States Secret Service (USSS), also as a Special Agent. I have also participated in searches, arrest and seizure warrants involving a variety of offenses.

3. The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during this investigation from other individuals, including other law enforcement officers, my review of relevant documents and records, communications with others who have personal

1



knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth every fact learned during the course of this investigation.

4. Based on the information developed, I respectfully submit there is probable cause to believe that Haven and Eagle Creek illegally stored hazardous wastes from their operations at the premises. The storage of hazardous wastes without permit is prohibited under Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d)(2)(A). These acts appear to be in violation of this statute.

5. There is probable cause to believe that evidence, fruits, and/or instrumentalities of these crimes, such as stored waste, hazardous chemicals, business records and computer files showing purchases or transactions, are located at the premises. These chemicals, files and records appear to show that hazardous wastes were illegally stored by Haven and Eagle Creek on the premises.

## **COMPUTER AND DOCUMENTARY EVIDENCE**

6. Your Affiant knows that businesses regularly dealing with chemicals and biofuels usually maintain files at their place of business and/or residence including, among others, chemical purchases, sale orders, waste manifest, correspondence, records of payments and billing information. Your Affiant also knows that businesses typically maintain accounting and bookkeeping records, including ledgers, books and records, banking records, and account statements.

7. Your Affiant knows that it is rare for businesses to operate without the use of a computer to store information related to the business, to store accounting and bookkeeping records,



and/or to electronically communicate with brokers, vendors, clients, and other companies. Your Affiant also knows that small business owners often maintain business records at their office.

## LEGAL BACKGROUND
## HAZARDOUS WASTES REGULATION

8. The Resource Recovery and Conservation Act (RCRA) is the federal statute that regulates hazardous wastes. 42 U.S.C. §§ 6901-6992k. Its objectives include, among other things, protecting human health and the environment through stringent regulation of the generation, transportation, storage, treatment, and disposal of hazardous wastes. RCRA and the regulations promulgated thereunder accomplish these objectives by establishing a "cradle-to-grave" regulatory program that governs and tracks hazardous waste from the point of generation until its final disposition. 40 C.F.R. Parts 260-282.

9. RCRA defines a hazardous waste, in relevant part, as "a solid waste...which because of its quantity, concentration, or physical, chemical or infectious characteristics may (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness, or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

10. RCRA defines solid waste, in relevant part, as "any ... discarded material including solid, liquid, semisolid, or contained gaseous material resulting from industrial operations...." 42 U.S.C. § 6903(27). A solid waste is further defined, among other things, as any material which is discarded by being abandoned. 40 C.F.R. § 261.2(b)(2). A discarded material includes, among other things, a material that is "[a]ccumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated." Id. § 261.2(b)(3).

3



11. Solid waste is identified under RCRA as hazardous waste in two ways. First, a waste may be specifically listed as a hazardous waste. 40 C.F.R. §§ 261.30-261.38. The "listed" hazardous wastes are described as either a particular chemical compound or waste from certain industrial processes. 40 C.F.R. § 261.31. A second method of identifying hazardous waste is by its characteristics. Waste can be hazardous if it exhibits the characteristic of ignitability, corrosivity, reactivity, or toxicity as defined by RCRA. 40 C.F.R. §§ 261.20 through 261.24.

12. For example, a hazardous waste exhibits the characteristic of corrosivity when a representative sample of the waste has a pH less than or equal to 2 or greater than or equal to 12.5, as determined by a pH meter. 40 C.F.R. § 260.11. And, a hazardous waste exhibits the characteristic of toxicity if the Toxicity Characteristic Leaching Procedure (TCLP) determines that the waste meets the toxicity definition. The corresponding Hazardous Waste Regulation, 40 C.F.R. § 261.24, outlines the 40 contaminants the TCLP analysis tests for to determine if the Maximum Concentration of Contaminants for Toxicity Characteristic is met. If a solid waste fails the test for one or more of these compounds, the waste is considered to be a characteristic hazardous waste. For example, the regulatory level for heavy metal Cadmium is 1.0 mg/L.

13. Among other things, RCRA requires a generator of solid waste to determine if that waste qualifies as a hazardous waste, and if so, to provide for its proper storage, transportation, treatment, and disposal. 40 C.F.R. § 262.11.

14. Recognizing that generators produce waste in different quantities, EPA has established different categories of generators in the regulations. The volume of hazardous waste each generator produces in a calendar month determines which regulations apply to that generator. For example, a Large Quantity Generator (LQG) is one that generates 1,000 kilograms or more per month of hazardous waste (or more than one kilogram per month of acutely hazardous waste).

4



In general, LQGs may only accumulate hazardous waste on-site for 90 days without a permit but, otherwise, must obtain a RCRA permit. 40 C.F.R. § §262.34(b).

15. RCRA also requires that containers used to store regulated hazardous wastes be in good condition, be compatible with the waste, be closed, except when adding or removing waste, and be adequately labeled as to their contents and storage dates. 40 C.F.R. §§ 264.170-179.

16. Generators of hazardous waste are required to properly dispose of their waste at a disposal facility, known as a Treatment, Storage and Disposal ("TSD") facility, that is licensed and permitted under law to receive hazardous wastes. 40 C.F.R. §262.12.

17. Pursuant to RCRA's criminal provisions, it is illegal to improperly store or dispose of any hazardous materials either without a permit or in violation of a permit. 42 U.S.C. § 6928(d)(2)(A).

**PROBABLE CAUSE**

18. Haven Corporation, also known as Haven Chemical Corporation, Haven Corporation Profit Sharing, and Haven Corp, was a business owned and operated by Kinloch N. Yellott III, located at 6624 – 6630 Quad Avenue, Baltimore, MD 21237, that created electronic printed circuit boards, inks, adhesives, and flooring epoxies. According to the City of Baltimore, Kinloch N. Yellott is the listed property owner of 6624 - 6630 Quad Avenue, Baltimore, MD. See Attachment A for a detailed property description.

19. Eagle Creek Fuel Services, LLC was a company operating at 6630 Quad Avenue from October 2007 until October 2012 according to one of the owners, Joseph Kirby. In an interview with Kirby, he stated that he partnered with Kinloch Yellott III to create Eagle Creek Fuel Services, LLC, a company operating at 6630 Quad Avenue from October 2007 until October 2012.

5



20. On April 11, 2018, the owner of an adjacent business at 6640 Quad Avenue, called the Baltimore City Code Enforcement Office to complain of waste oil leaking from 6630 Quad Avenue onto their business property.

21. On April 13, 2018, EPA-CID received information from the Maryland Attorney General's Environmental Crimes Office that approximately one-hundred 55-gallon drums of unknown materials had been abandoned at a site located at 6630 Quad Ave., Baltimore, MD.

22. In an interview with EPA-CID on April 25, 2018, Yellott stated that the property in question consists of 6624 Quad Avenue and 6630 Quad Avenue. Yellott also claimed that he walked away from the property approximately twenty months to two years ago. Finally, Yellott said that flammable materials could still be inside of the property.

23. According to Kirby, Eagle Creek was collecting used waste vegetable oil (WVO), and attempting to refine it and produce saleable and marketable biodiesel. He also stated that chemicals such as glycerin, potassium hydroxide and methanol were part of the process of creating biodiesel.

24. On May 2, 2018, Baltimore City Department of Housing and Community Development, Special Investigations Unit (DHCD-SIU) conducted a search on the property pursuant to an administrative warrant. They were assisted by personnel from the Baltimore City Fire Department (BCFD) Hazmat Unit, the Mayor's Office of Emergency Management and a Baltimore City Department of Housing Inspector. During the warrant, Investigators observed and took photographs of, but not limited to, Material Safety Data Sheets, business records, invoices, utility bills, shipping labels, tax records and printed emails. BCFD observed and reported that over one-thousand 55-gallon drums existed on the property, some drums were labeled as hazardous and/or flammable chemicals. BCFD also deemed the building to be abandoned and an unsafe



structure.

25. Continuing on the same day, an Investigator with the Baltimore City Department of Housing recalled seeing at least two desktop computers in the offices of 6624 – 6630 Quad Avenue.

26. On May 24, 2018, the EPA's On Scene Coordinator (OSC) -- the federal Superfund official responsible for monitoring or directing responses to threats or actual releases of oil spills and hazardous substances reported to the federal government -- met with the property owner Yellott. They conducted a walk-through of the premises along with an investigator from the Baltimore City DHCD-SIU, and representatives from MDE and EPA's Superfund Technical Assessment & Response Team (START) contractors. Based on the property inspection along with information previously obtained from the city and state, the OSC recommended a Superfund removal action.

27. RCRA requires that containers used to store regulated hazardous wastes be in good condition, be compatible with the waste, be closed, except when adding or removing waste, and be adequately labeled as to their contents and storage date(s). The chemicals left by Haven and Eagle Creek at the premises were not stored in accordance with RCRA storage requirements.

28. On August 2, 2018, U.S. Magistrate Judge J. Mark Coulson issued an administrative warrant authorizing the performance of limited response action to allow EPA to mitigate threats at the Site. On August 8, 2018, EPA and its Emergency and Rapid Response Services (ERRS) cleanup contractor mobilized equipment and personnel to the site.

29. On November 6, 2018, an EPA OSC informed EPA-CID that their hazardous category results identified more than 1,100 containers, most of which are 55-gallon drums. During inventory, an EPA OSC sampled and tested approximately sixty-six containers which were



found to have acidic material with a pH balance of less than three, some of which were also flammable; approximately twelve containers which were found to be a caustic liquid with a pH balance greater than twelve; and approximately one-hundred and ninety-four containers which were found to be a flammable material.

30. Based on the number of containers observed on the premises, Haven Corporation and Eagle Creek appear to be Large Quantity Generators (LCG) of hazardous waste. The premises did not at any time have an EPA permit under Title 42, United States Code, § 6925, to store, treat or dispose of hazardous waste.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND OTHER MEDIA

31. Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, your Affiant knows that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. Your Affiant also knows that during the search of the premises it is not always possible to search computer equipment and storage devices for data for several reasons, including the following:

    a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

    b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden,"

8

erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

   c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would completely fill a 35' x 35' x 10' room to the ceiling. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

   d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another

9



seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

32. Based on your Affiant's experience and his consultation with other agents who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

    a. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

    b. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases like the instant



one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

33. Your Affiant will involve the use of computer forensic examiners while executing warrants at the respective locations, in an attempt to image any and all computer-related media, software and servers on-site. Based upon the size and number of devices encountered, however, it may not be entirely possible to image everything on-site. In the event that a device cannot be imaged on-site, the device will be imaged off-site at a forensic computer lab in the most expedient manner possible. While your Affiant cannot guarantee the actual length of time it will take to image a device(s) off-site, your Affiant believes that four (4) weeks would be a reasonable time frame to accomplish this task.

## CONCLUSION

34. Based on your Affiant's training and experience, as well as the evidence set forth above, your Affiant believes that probable cause exists that the items described on Attachment B will be found within the subject premises identified in Attachment A. The items listed on Attachment B constitute evidence, fruits and/or instrumentalities of alleged violations of (a) the Resource Recovery and Conservation Act, for the illegal storage of hazardous waste without a permit or in violation of a permit, 42 U.S.C. § 6928(d)(2)(A).

WHEREFORE, in consideration of the facts presented, your Affiant respectfully requests that the Court issue a search warrant for the location identified in Attachment A to this Affidavit



allowing Special Agents of the Environmental Protection Agency- Criminal Investigation Division, other federal, state or local agencies to include all required support personnel, including contractors, to search, photograph, sample, image and seize the items further described in Attachment B to this Affidavit.

*Zachary Thomas* 11/13/18
Zachary Thomas, Special Agent
EPA-CID

Sworn to before me this 13th day of November, 2018.

_____
Stephanie A. Gallagher
United States Magistrate Judge

## ATTACHMENT A

### Description of Property to be Searched

The premise known as Haven Corporation is located at 6624 – 6630 Quad Avenue, Baltimore, Maryland 21237. The premise consists of two commercial buildings on the property; one to the east at 6630 Quad Ave, and one to the west at 6624 Quad Avenue. The two buildings are predominantly one-story warehouses, approximately 12,800 square feet and consist of offices, a laboratory, packaging space, warehouses, a break room, and a storage trailer in the rear. The two buildings are joined by a shared loading dock. Around the buildings is an area of overgrown grass and pavement where numerous storage containers and automobiles sit. There is a large blue and white sign on the front of the building with the company name "HAVEN" next to a blue front entrance door with the numbers "6630" above it. With the exception of a paved parking lot in the front, the property is surrounded by fencing on all sides. The location has also been identified by Latitude/ Longitude  39.301623 / -76.534290.

See attached photograph of site below:





## **Items to be Seized – Attachment B**

A.    Records and other items relating to Haven Corporation and Eagle Creek Fuel Services, LLC.

1.    All financial records, including but not limited to accounting records, tax records, accounts receivable and payable logs and ledgers, balance sheets, profit and loss statements, banking records, real estate records and other records reflecting income and expenditures of Haven Corporation and Eagle Creek Fuel Services, LLC.

2.    Any and all documents sufficient to show bank accounts, escrow accounts, credit card accounts, brokerage accounts, off-shore accounts, trust accounts, security deposit boxes, and other financial accounts of Haven Corporation and Eagle Creek Fuel Services, LLC.

3.    Any Material Safety Data Sheets ("MSDS"), AKA Safety Data Sheets for hazardous and non-hazardous substances stored or used at the Site;

4.    All chemical purchases, chemical sales, and waste manifest.

5.    All laboratory testing involving Haven Corporation and Eagle Creek Fuel Services, LLC.

6.    All Company policies, protocols, procedures, operating manuals, training records, directions or instructions for metal plating or treatment and records relating to employee training and supervision.

7    All permits, applications for permits, licenses, application for licenses pertaining to waste generation, treatment, storage, management or disposal, and transportation of waste materials to and/or from this site



8. All memoranda, internal communications, manifests, notes, invoices, operational instructions, hazardous waste determinations and/or characterizations, or other documents relating to the generation, treatment, storage, disposal or management of waste materials at this site.

9. All shipping documents, manifests, freight bills, memoranda of shipments, bills of lading and all other shipping related documents related to the transportation of waste materials to or from this site.

10. Any and all cellular telephones used by Kinloch Yellott III and Joseph Kirby.

B. Samples

Samples of materials in containers, drums, vats, tanks, sewer lines, storm lines, floor drains, materials on the grounds, or otherwise identify RCRA violations, and associated plumbing, that could also identify violations of RCRA and/or CWA violations

C. Computer(s) and any data storage devices including DVDs, CDs, flash drives, floppy diskettes, fixed hard drives, removable hard disks, and/or memory devices of any form, computer hardware, hard drive(s) from copying machines, software, servers, and related documentation, passwords, data security devices (as described below), videotapes, video recording devices, video recording players, monitors, and or televisions, flatbed scanners, and data that may contain any of the items enumerated in paragraphs I (A-N).

1. The computers may be searched for any of the items described in paragraphs A. (1-10) above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard disks, or removable hard disk cartridges, software or memory any form.

2. With respect to the search of any digitally/electronically stored information that is seized pursuant to this warrant, the search procedure shall include such reasonably available techniques designed to minimize the chance that the Government investigators conducting the



search will view information that is beyond the scope for which probable cause exists. The following list of techniques is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search, and the government may use other procedures that, like those listed below, minimize the review of information not listed within the items to be seized herein:

    a.    Use of computer search methodology to conduct an examination of all the data contained in such computer hardware, computer software, servers, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein by specific date ranges, or names of entities and individuals;

    b.    Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein; Physical examination of the storage device, including digitally surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

    c.    Opening or reading portions of files that are identified as a result of conducting digital search inquiries in order to determine whether their contents fall within the items to be seized as set forth herein;

    d.    Digitally scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such deleted data, and to search for and recover files falling within the list of items to be seized; and/or

    e.    Performing key word or similar searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described herein.

